FILED
2017 Feb-28  PM 01:50
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
EASTERN DIVISION

| | |
|---|---|
| KATHIE WILSON, ) | |
| ) | |
| CLAIMANT, ) | |
| ) | |
| v. ) | CIVIL ACTION NO. |
| ) | 1:15-CV-01311-KOB |
| ) | |
| NANCY BERRYHILL ) | |
| ACTING COMMISSIONER OF ) | |
| SOCIAL SECURITY ) | |
| ) | |
| RESPONDENT. ) | |
| ) | |

MEMORANDUM OPINION

I. INTRODUCTION

On May 14, 2012, the claimant, Kathie Wilson, protectively applied for disability
and disability insurance benefits under Title II and part A of Title XVIII of the Social
Security Act. (R. 126). The claimant initially alleged disability commencing on February
1, 2010. (R. 126). The Commissioner denied the claim on July 23, 2012. (R. 60). The
claimant filed a timely request for a hearing before an Administrative Law Judge, and the
ALJ held a hearing on October 23, 2013. (R. 5, 27).

In a decision dated January 21, 2014, the ALJ found that the claimant was not
disabled as defined by the Social Security Act and was, therefore, ineligible for social
security benefits. (R. 8-26). On June 4, 2015 the Appeals Council denied the claimant's
requests for review. (R. 1-4). Consequently, the ALJ's decision became the final decision
of the Commissioner of the Social Security Administration. The claimant has exhausted

her administrative remedies, and this court has jurisdiction pursuant to 42 U.S.C.
§§405(g) and 1383(c) (3). For the reasons stated below, this court AFFIRMS the decision
of the Commissioner.

## II. ISSUES PRESENTED

The issue before the court is whether, under the Eleventh Circuit's pain standard,
the ALJ properly assessed the claimant's subjective complaints of disabling pain.

## III. STANDARD OF REVIEW

The standard for reviewing the Commissioner's decision is limited. This court
must affirm the ALJ's decision if the ALJ applied the correct legal standards and if
substantial evidence supports the ALJ's factual conclusions. *See* 42 U.S.C. § 405(g);
*Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996,
999 (11th Cir. 1987).

"No…presumption of validity attaches to the [Commissioner's] legal conclusions,
including determination of the proper standards to be applied in evaluating claims."
*Walker*, 826 F.2d at 999. This court does not review the Commissioner's factual
determinations *de novo*. The court will affirm those factual determinations that are
supported by substantial evidence. "Substantial evidence" is "more than a mere scintilla.
It means such relevant evidence as a reasonable mind might accept as adequate to support
a conclusion." *Richardson v. Perales*, 402 U.S. 389, 402 (1971).

The court must keep in mind that opinions, such as whether a claimant is disabled,
the nature and extent of a claimant's residual functional capacity, and the application of
vocational factors, "are not medical opinions,…but are, instead, opinions on issues
reserved to the Commissioner because they are administrative findings that are

2

dispositive of a case; i.e., that would direct the determination or decision of disability."
20 C.F.R. §§ 404.1527(d), 416.927(d). Whether the claimant meets the listing and is
qualified for Social Security disability benefits is a question reserved for the ALJ, and the
court "may not decide facts anew, reweigh the evidence, or substitute [its] judgment for
that of the Commissioner." *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005).
Thus, even if the court were to disagree with the ALJ about the significance of certain
facts, the court has no power to reverse that finding as long as substantial evidence in the
record supports it.

The court must "scrutinize the record in its entirety to determine the
reasonableness of the [Commissioner]'s factual findings." *Walker*, 826 F.2d at 999. A
reviewing court must not only look to those parts of the record that support the decision
of the ALJ, but also must view the record in its entirety and take account of evidence that
detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179, 1180
(11th Cir. 1986).

## IV. LEGAL STANDARD

Under 42 U.S.C. § 423(d) (1) (A), a person is entitled to disability benefits when
the person is unable to "engage in any substantial gainful activity by reason of any
medically determinable physical or mental impairment which can be expected to result in
death or which has lasted or can be expected to last for a continuous period of not less
than 12 months...." 42 U.S.C. § 423(d) (1) (A). To make this determination the
Commissioner employs a five-step, sequential evaluation process:

> (1) Is the person presently unemployed?
> (2) Is the person's impairment severe?
> (3) Does the person's impairment meet or equal one of the specific
> impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?

(4) Is the person unable to perform his or her former occupation?

(5) Is the person unable to perform any other work within the economy?

An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986)[1]; 20 C.F.R. §§ 404.1520, 416.920.

## V. FACTS

The claimant was fifty-four years old at the time of the ALJ's final decision. (R. 30). The claimant has a tenth grade education and past relevant work as a retail salesperson, manager, administrative assistant, receptionist, and bookkeeper. (R. 32, 196). The claimant alleges disability based on depression, high blood pressure, COPD, Lupus, Fibromyalgia, Osteoarthritis, and Osteoporosis. (R. 164).

### *Physical and Mental Impairments*

On April 10, 2009, the claimant visited Dr. Michael I. Hanna at Anniston Medical Clinic, her primary physician, regarding Hyperlipidemia, Hypertension, and Depression. Dr. Hanna reported positive improvement in all three areas. Subsequently, on July 27, 2009, all examinations showed no distinct abnormalities, although the claimant expressed concern about an episode of chest pain. Dr. Hanna referred the claimant to Dr. Stephen Baker, a cardiologist at Cardiovascular Associates of the Southeast, for a definitive cardiac assessment. (R. 293).

On July 29, 2009, Dr. Baker performed a routine cardiac assessment that

---

[1] *McDaniel v. Bowen*, 800 F.2d 1026 (11th Cir. 1986) was a supplemental security income case (SSI). The same sequence applies to disability insurance benefits. Cases arising under Title II are appropriately cited as authority in Title XVI cases. *See, e.g.*, *Ware v. Schweiker*, 651 F.2d 408 (5th Cir. 1981) (Unit A).

identified several CV risk factors that were assessed by cardiac catheterization. After a left heart catheterization with coronary angiography yielded negative results, Dr. Baker prescribed Nexium and recommended GI evaluation and workup for noncardiac causes of chest pain. Similarly, Dr. Joel Mixon, a radiologist, found no abnormalities after evaluating x-ray results. (R. 222-25, 238).

The claimant returned to Dr. Hanna on August 21, 2009 for treatment of acute sinusitis and bronchitis. Dr. Hanna prescribed Rocephin, Kenalog, and Augmentin, and ordered a chest x-ray. He also notes in his report that he gave her extensive counseling on smoking cessation. On August 26, 2009, the chest ex-ray showed hyperinflation, so Dr. Hanna began the claimant on an aggressive antibiotic. (R. 293-94).

On September 3, 2009, Dr. Mohammed K. Shubair, a pulmonologist at Anniston Medical Clinic, evaluated and diagnosed the claimant with COPD. Dr. Shubair explained to the claimant that COPD, caused by smoking, induced the claimant's shortness of breath. He counseled her about smoking cessation again, and prescribed Symbicort and steroid therapy. Dr. Shubair also ordered an echocardiogram, ASR, CRP, and Alpha 1 Antitrypsin test. Two weeks later, Dr. Shubiar evaluated the echocardiogram results, finding a borderline mitral valve and a mild obstructive defect caused by mild COPD, secondary to smoking. Dr. Shubiar again encouraged the claimant to quit smoking, discharged her as a patient, and recommended that she returned to Dr. Hanna for regular follow ups. (R. 291, 294).

Subsequently, on December 4, 2009 Dr. Hanna evaluated the progression of the claimant's COPD. The claimant reported improvement and denied any chest pain or shortness of breath.

After an onset of Osteoporosis and joint pain, Dr. Hanna referred the claimant to Dr. Vishala L. Chindalore, a Rheumatologist at Anniston Medical Clinic. On February 22, 2010, Dr. Chindalore diagnosed the claimant with Osteoporosis, diffuse arthralgias, and osteoarthritis, and prescribed Lyrica for possible myofascial pain syndrome. He ordered multiple tests to be reviewed two weeks later. During a follow-up on March 12, 2010, Dr. Chindalore noted that the claimant had neck pain, C-spine arthritis, some neuroforamenal encroachment, muscle spasms, and stable osteoarthritis. He further stated that the claimant showed no criterion for lupus, and no connective tissue disease was evident.[2] The claimant did not respond well to Lyrica, so Dr. Chindalore discontinued use of it and prescribed Flexeril instead. Subsequently, on March 15, 2010, the claimant called Dr. Chindalore seeking an alternative pain treatment. She claimed that prescribed pain medication did not allow her to take care of her children and perform other daily activities. Dr. Chindalore requested that the claimant schedule a follow-up appointment. (R. 289-92).

During the claimant's follow-up appointment on April 16, 2010, Dr. Chindalore stressed that the claimant did not have lupus, and held a detailed discussion with the claimant about her various conditions. She expressed that she stopped Flexeril and Boniva, and stated that she could not tolerate Fosamax, so Dr. Chindalore explained that he would consider Reclast, but needed to check her insurance coverage. He referred the claimant to Dr. James G. White III, a neurologist at North East Alabama Neurology. (R. 285, 290).

---

[2] This appointment was the first time a doctor noted lupus. The claimant consistently stated that she was diagnosed with lupus; however, a diagnosis was not evident in any medical record.

On April 26, 2010, Dr. White ordered x-rays of the claimant's neck and a cervical MRI. (R. 257). The MRI, reviewed with the claimant on April 27, 2010, showed reversal of cervical lordosis centered at the C5-6 level resulting in slight encroachment of the ventral thecal sac at C5 and C6, and mild degenerative disc disease at C5-6 and C6-7 with some posterolateral spurring resulting in moderate foraminal encroachment bilaterally. There was no identifiable disc herniation or other significant abnormality. (R. 258). Dr. White opined that surgery was not necessary, but recommended cervical epidurals, and suggested that the claimant return to Dr. Chindalore for further treatment. (R. 255).

The claimant continued to see Dr. Hanna regarding her COPD, hypertension, osteoarthritis, and chronic pain on June 28, 2010 and again on October 29, 2010. The claimant missed an appointment with Dr. Chindalore scheduled for January 14, 2011.[3] (R. 286, 283).

At the request of Dr. Hanna, the claimant visited Dr. Clinton M. Ray, an orthopedist at Orthopedics & Sports Medicine, on February 23, 2011, who suggested physical therapy after a physical exam showed good range of motion, yet tenderness in the claimant's spine and joints. (R. 269).

The claimant returned to Dr. Chindalore and Dr. Hanna a total of three times in March and April 2011. Dr. Chindalore ordered another MRI on March 4, 2011 after the claimant complained of severe pain in her spine. The MRI did not yield significant results. *Id*. Likewise, on May 2, 2011, upon Dr. Hanna's referral, the claimant underwent an ultrasound that showed no significant abnormality. Dr. Hanna and Dr. Chindalore

---

[3] The medical record does not state a reason the claimant missed the appointment.

were puzzled by the outcome of these tests, so Dr. Chindalore began evaluating the claimant for lupus again, and Dr. Hanna prescribed Levaquin and referred the claimant to Dr. Michael Kline for a definitive assessment.[4] (R. 281-84, 299).

On May 26, 2011, the claimant underwent a neurology consultation with Dr. Lisa Esposito upon referral from Dr. Chindalore. Dr. Esposito diagnosed the claimant with arthritis of the hip and sacroiliac joint pain treatable with steroid injections. (R. 260).

The claimant missed an appointment with Dr. Chindalore on July 8, 2011.[5] Subsequently, upon Dr. Hanna's request, the claimant consulted with Dr. Monica Crawford at the Crawford Clinic on August 8, 2011 who diagnosed the claimant with osteoporosis, positive ANA, and polyarthralgia and prescribed Relafen and Robaxin. (R. 263-64, 282).

In September and October 2011, the claimant returned to the care of Dr. Hanna who began the claimant on a course of Savella for chronic pain. During her November 16, 2011 follow-up, the claimant reported almost complete resolution of the hip pain; however she was experiencing severe pain in her right leg. Dr. Hanna referred the claimant back to Dr. Ray for orthopedic treatment. *Id*. On December 6, 2011, Dr. Ray stated that he had exhausted all treatment avenues, and recommended that the claimant be seen by spine and pain management specialists. (R. 268, 279, 282).

On January 12, 2012, the claimant, without referral, sought pain treatment from Dr. Faulkner at Lemak Sports Medicine. Dr. Faulkner requested an MRI and bone scan of

---

[4] The record does not reflect any medical records from Dr. Kline or any indication that Dr. Kline ever evaluated the claimant.
[5] The medical record does not state a reason the claimant missed the appointment.

the claimant. Both were performed on January 18, 2012, and both yielded negative results. (R. 443, 451-52).

The claimant again returned consistently to Dr. Hanna for five more visits from March to June of 2012 until determining that monitoring the condition every three months was sufficient. (R. 278-80, 320). On April 24, 2012, Dr. Hanna referred the claimant to Dr. Shailesh Upadhyay for chronic pain management.[6] (R. 278, 317).

On May 31, 2012, the claimant's daughter, Jennifer L. Kennedy, completed an Adult Third Party Function Report at the request of the Social Security Administration. Ms. Kennedy stated that the claimant had no problems with personal care, and performed household chores such as cleaning, doing laundry, ironing, and mopping, while still able to shop for groceries and clothes, run errands, manage financial affairs, watch television, and use the computer without assistance. (R. 178-85).

Likewise, the claimant completed an Adult Function Report on June 4, 2012 at the request of the Social Security Administration. The claimant indicated that she is capable of attending to personal care with some limitations, independent of direction or supervision. She also stated that she took care of her husband, stepson and two cats. (R. 186-93).

Upon Dr. Ray's referral in February 2011, the claimant attended a physical therapy consultation with Dr. Marilyn Ann Osipik Burson at Northeast Alabama Regional Medical Center on May 30, 2012. (R. 423). Dr. Burson ordered an MRI on June 4, 2012 for physical therapy purposes that yielded no significant abnormalities. (R. 416). Subsequently, on October 15, 2012, Dr. Burson gave the claimant a series of home

---

[6] Dr. Upadhyay's office advised the Disability Determination Service that the claimant was not a patient at Medical Pain Management.

exercises to carry out. (R 404). During a follow-up appointment with Dr. Burson on November 20, 2012, the claimant reported significant improvement, and Dr. Burson recommended that the claimant begin outpatient therapy. (R. 395). The claimant scheduled five outpatient therapy sessions in December, three of which she cancelled.[7] (R. 380-84).

During a follow-up appointment with Dr. Burson on January 23, 2013, the claimant received piriformis injections near trigger points to assist in stretching. On January 28, 2013, outpatient physical therapy discharged the claimant for lack of physical therapy attendance. (R. 361, 365).

The claimant began physical therapy with Dr. Burson's office again on February 4, 2013. The claimant scheduled eleven outpatient therapy sessions in February and March. The claimant cancelled or failed to show up to three sessions, and attended eight. *Id*. Ultimately, Dr. Burson discharged the claimant on March 4, 2013.[8] (R. 332-53).

The October 1, 2012 and January 31, 2013 check-up appointments with Dr. Hanna rendered no diagnostic changes. Similarly, on July 22, 2013, Dr. Hanna noted hyperlipidemia improvement, and stable hypertension; however, the claimant stated that she felt no physical improvement, and explained that she had been very busy taking care of her daughter who was diagnosed with cancer, which gives her anxiety. (R. 321-26).

*The ALJ Hearing*

At the hearing on October 23, 2013, the claimant testified that she lives at home with her husband and fifteen-year-old stepson. She testified that she drives two times a

---

[7] The record indicates that she cancelled these therapy sessions either to take care of her stepson, or because she was too fatigued to attend the appointment.

[8] The physical therapy record does not report a reason for the claimant's second discharge from physical therapy.

week, typically to visit her grandchildren; however, her husband drove her to the hearing. (R. 31-32).

The claimant further testified that she has been treated for depression and anxiety for four years, and has been prescribed several different medications, none of which helped her condition. She stated that the depression and anxiety do not allow her to leave her house, sleep, or eat often, and as a result, she has lost about 20 pounds. (R. 32-34).

The claimant testified that she goes to Wal-Mart once or twice a week either by herself or her husband assists her. Other than short outings, she stays at home, as large crowds provoke her anxiety. While at home, the claimant testified she consistently sleeps, which is a side effect from her medication. (R. 34-35).

When questioned about her physical diagnoses, the claimant testified that she has osteoarthritis in her right hip, which yielded an eight out of ten on the pain scale. She stated that the narcotic medication prescribed for the osteoarthritis makes her nauseous, so she is unable to take it. Similarly, the non-narcotic medication continued to yield negative side effects, so she only takes half of the prescribed medication at a time. Then, the claimant testified to having a disc that is displaced in her lower spine, which yielded a seven out of ten on the pain scale. She testified that she takes the same medication for her back as she does for her hip. (R. 35-38).

The claimant testified that she has been diagnosed with lupus, which affects the joints in her hands, wrist, and knee, and flares her osteoporosis. Similarly, her hypertension makes her anxious and lightheaded, also affecting her pain tolerance. She testified that the pain would not allow her to work because she cannot sit, stand, or lay long; she has to rotate positions all day long to be comfortable. (R. 38-40). The claimant

11

spoke to her ability to do chores, as she is unable to clean her house, cook, or walk outside beyond her deck. (R. 40)

A vocational expert, Ms. Leigh Clemmons, testified concerning the type and availability of jobs that the claimant was able to perform. Ms. Clemmons testified that the claimant's past relevant work was as a receptionist, a general office clerk, a sales clerk, and a loan clerk. Ms. Daniel classified the receptionist position as sedentary and semi-skilled work; the general office clerk position as light and semi-skilled work; the sales clerk position as light and semi-skilled work; and the loan clerk position as sedentary and semi-skilled work. (R. 41-42).

The ALJ asked Ms. Clemmens to assume that a hypothetical individual with the same age, education, and work experience as the claimant is limited to light work with occasional pushing and pulling of foot controls with the right lower extremity; occasional climbing ramps and stairs, balancing, stooping, kneeling, crouching and crawling; no climbing ladders or scaffolds; no environments with unprotected heights and hazardous moving mechanical parts; simple tasks; not able to perform at a production rate but can perform goal-oriented work; limited to simple work-related decisions; with occasional public contact; brief interaction with coworkers and supervisors should be brief; and few changes in a routine work setting. Ms. Clemmens stated the hypothetical individual could not perform the claimant's previous work based on the mental limitations of the RFC. The ALJ asked Ms. Clemmens if other jobs exited in the region or nation that the individual could perform. Ms. Clemmens replied that the hypothetical individual could perform work as a garment sorter, classified as light exertion, and unskilled work, with over 10,000 jobs in the region and over 200,000 jobs in the nation; inspector, classified as

light exertion, unskilled work, with over 9,000 jobs in the region and over 400,000 jobs in the nation; and tagger, classified as light exertion, unskilled work, with over 4,000 jobs in the region and over 300,000 in the nation. (R. 42-43).

The ALJ then added an additional limitation of sit/stand at will, and asked if the same jobs would remain available. Ms. Clemmens testified that the same jobs would remain available, and the numbers would stay the same. (R. 43).

*The ALJ's Decision*

On January 21, 2014, the ALJ issued a decision finding that the claimant was not disabled under the Social Security Act. First, the ALJ found that the claimant met the insured status requirements of the Social Security Act through December 31, 2013, and had not engaged in substantial gainful activity since her February 1, 2010 alleged onset date. (R. 8).

Next, the ALJ found that the claimant had the severe impairments of positive antinuclear antibody (ANA), polyarthralgia; osteoporosis; mild cervical and lumbar degenerative disc disease; hypernsion; anxiety; and depression. The ALJ noted that the claimant's hyperlipidemia was improving, rendering it nonsevere. Similarly, the ALJ stated the claimant's mild COPD was secondary to smoking, rendering it nonsevere. Additionally, the ALJ found that the claimant's medical notes indicate a diagnosis of fibromyalgia; however, the record does not contain objective evidence supporting a fibromyalgia disability consistent with the three requirements set forth in Social Security Ruling 12-2p. Similarly, the ALJ explained that the claimant's alleged lupus diagnosis was inconsistent with the objective medical evidence in the record. (R. 13-14).

The ALJ next found that the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. The ALJ considered whether the claimant met the criteria for listing 12.04 and 12.06 "paragraph B" concerning mental impairments. To meet this listing, the claimant would have to demonstrate that the mental impairments result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. The ALJ noted that based on the claimant's reported daily activities and social functioning, such as cooking, shopping, and managing finances, her mental impairments did not cause at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation, each of extended duration. (R. 15-16).

Additionally, the ALJ considered whether the claimant met the requirements of "paragraph C," requiring evidence of episodes of decompensation, potential episodes of decompensation, or the inability to function outside a highly supportive living arrangement. The ALJ determined that the claimant did not meet these requirements. (R. 16).

Next, the ALJ determined that the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except for the following limitations: occasional pushing and pulling of foot controls with the right lower extremity; occasional climbing stairs and stairs; no climbing ladders and scaffolds; occasional balancing, stooping, kneeling, crouching, and crawling; no environments of

unprotected heights or hazardous moving mechanical parts; and an option to sit/stand at will. Mentally, the claimant is limited to simple tasks and is not able to perform at a production rate, but can perform goal oriented work; simple work-related decisions; occasional interaction with the public and brief interaction with coworkers and supervisors; and tolerating few changes in a routine work setting. (R. 16).

In making this finding, the ALJ considered the claimant's symptoms and the corresponding medical record. The ALJ concluded that, although the claimant's medically determinable impairments could reasonably be expected to cause her symptoms, the claimant's allegations regarding the intensity, persistence, and limiting effects of those symptoms were not fully credible when compared with the evidence. (R. 21).

First, the ALJ considered the claimant's allegations in light of the medical record. She discussed Dr. James White's MRI evaluation on April 27, 2010, which showed mild degenerative disease with some posterolateral spurring resulting in moderate foraminal encroachment bilaterally, but no definite disc herniation or other significant abnormalities.  Similarly, the ALJ noted the the March 4, 2011 MRI that showed the appearance of scoliosis, but no definite focal finding or abnormal enhancement; a musculoskeletal examination performed on August 28, 2011 that showed good range of motion of the cervical spine, shoulders, elbows, wrists, metacarpophalangeal and interphalangeal joints, and no abnormalities in muscle tone or atrophy; and an additional MRI performed on January 18, 2012 that showed mild facet hypertrophic changes at L4-L5, but no evidence of significant canal or foraminal encroachment. Mild osteophytic lipping, and mild degenerative changes were also present. The ALJ added much emphasis

to the consistent use of the word "mild." (R. 19).

The ALJ gave great weight to Dr. Robert Estock's opinion regarding the claimant's mental allegations, as it is compatible with the residual functional capacity assessment. Dr. Estock found that the claimant was able to work with certain mental limitations, and ultimately concluded that the claimant was not disabled. (R. 20).

The ALJ then considered the claimant's daily activities and determined that they were inconsistent with her allegations of disabling symptoms and limitations. She noted that the claimant is able to complete activities, such as personal care, preparing meals, shopping, driving, and managing finances all independent of direction or supervision. Additionally, in a third party report, the claimant's daughter indicated that the claimant has no problems with personal care, household chores, such as cleaning, laundry, ironing, mopping, and shopping. Finally, the ALJ noted that not only was the claimant successfully taking care of herself, she was also acting as a caregiver to her husband and children. The ALJ explained, in great detail, how her role as a caregiver demonstrates that she performs functions inconsistent with her alleged disabilities. After considering the medical evidence and the claimant's daily activities, the ALJ found that good reasons existed for questioning the reliability of the claimant's subjective complaints. (R. 20).

Finally, the ALJ, relying on the vocational expert's testimony, found that the claimant is unable to perform any of her past relevant work. The ALJ determined that based on the claimant's age, education, work experience, residual functional capacity, and the vocational expert's testimony, jobs existed in significant numbers in the national economy that the claimant could perform, including working as a garment sorter, inspector, and tagger. Thus, the ALJ concluded that the claimant was not disabled as

defined under the Social Security Act. (R. 21-22).

VI. DISCUSSION

The claimant argues that the ALJ improperly discredited the claimant's subjective complaints of pain and characterizations of her physical limitations. To the contrary, this court finds that substantial evidence supports the ALJ's findings and that she applied the appropriate legal standards to her evaluation of the claimant's subjective complaints and allegations of pain.

A Commissioner evaluating a claimant's pain and other subjective complaints must first consider whether the claimant demonstrated an underlying medical condition. *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991); *see also Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002); 20 C.F.R. § 404.1529.  If the claimant demonstrates an underlying medical condition, the Commissioner must then determine if any objective medical evidence confirms the severity of the alleged pain, or if the underlying medical condition has been objectively confirmed and is so severe that one could reasonably expect it to give rise to the alleged pain. *Id.* Subjective testimony can satisfy the pain standard if the testimony is supported by objective medical evidence. *Foote v. Chater,* 67 F.3d 1553, 1561(11th Cir. 1995).

The ALJ must articulate reasons for discrediting the claimant's subjective testimony. *Foote*, 67 F.3d at 1561-62; *Brown v. Sullivan*, 921 F.2d 1233, 1236 (11th Cir. 1991). The reasons articulated for discrediting the claimant's testimony may include the claimant's daily activities. *Harwell v. Heckler*, 735 F.2d 1292, 1293 (11th Cir. 1984). However, if the ALJ does not articulate reasons, the court must accept the claimant's testimony as true. *Holt*, 921 F.2d at 1236.

On March 16, 2016, the Social Security Administration issued a Notice of Social Security Ruling, which provides guidance and clarification on how to evaluate claimant statements about "the intensity, persistence, and limiting effects of symptoms in disability claims under Titles II and XVI . . . and blindness claims under Title XVI of the Act." SSR 16-3p, 81 Fed. Reg. 14166-01 (Mar. 16, 2016). Concerned that subjective evidence was being viewed in light of the claimant's personal character, the Social Security Administration clarified the two step pain standard, eliminating the term "credibility," and delineating that evaluation of subjective evidence is not an analysis of the claimant's character:

> Step 1: We Determine Whether the Individual Has a Medically Determinable Impairment (MDI) That Could Reasonably be Expected to Produce the Individual's Alleged Symptoms . . . Step 2: We Evaluate the Intensity and Persistence of an Individual's Symptoms Such as Pain and Determine the Extent to Which an Individual's Symptoms Limit His or Her Ability To Perform Work-Related Activities for an Adult or To Function Independently, Appropriately, and Effectively in an Age-Appropriate Manner for a Child With a Title XVI Disability Claim.

*Id*. (emphasis omitted).

The Social Security Administration did not explicitly deem this ruling retroactive, and neither the Eleventh Circuit nor any district court within it has addressed the ruling's retroactivity. *See Hargress v. Berryhill*, No. 4:16-cv-1079-CLS, 2017 WL 588608, at *2 (N.D. Ala. Feb. 14, 2017) (stating that "[t]he retroactivity of the Rule has not been directly addressed by any Circuit Court of Appeals, or by any district court within this Circuit."). However, even if the court applied SSR 16-3p retroactively, the ALJ did not violate it in this case. *See id*. (explaining that "[e]ven though the ALJ used the word 'credible,' he did not assess claimant's *general*, or 'overall' character or truthfulness."). Although the ALJ in this case used the term "credible" throughout the opinion, he did not

use the term to assess the claimant's character. The ALJ properly analyzed the claimant's subjective evidence in light of the objective medical evidence to determine that the subjective evidence was not medically supported.

Furthermore, the ALJ properly articulated her reasons for finding that the claimant's testimony about her pain and characterization of her physical capabilities no not warrant a disability. The ALJ concluded that, although the claimant's medically determinable impairments could reasonably be expected to cause symptoms, the claimant's allegations regarding the intensity, persistence, and limiting effects of these symptoms were not fully consistent with the evidence. (R. 21).

The ALJ set forth several reasons for finding the claimant's allegations inconsistent with the evidence. She found that the objective medical evidence conflicted with the claimant's allegations. Specifically, the ALJ noted the April 27, 2010 MRI that showed mild degenerative disease resulting in moderate encroachment; however, it showed no definite disc herniation or other significant abnormality. The ALJ also discussed the March 4, 2011 MRI that evidenced scoliosis, but again, no definite focal finding or abnormal enhancement. (R. 19).

The ALJ also relied on the Crawford Clinic's treatment note dated August 8, 2011,[9] that indicated good range of motion of the cervical spine, shoulders, elbows, wrists, metacarpophalangeal and interphalangeal joints. The same record indicated that the claimant had normal muscle tone and no muscle atrophy. Additionally, the ALJ

---

[9] The ALJ report references an August 28, 2011 Crawford Clinic report as reflected in Exhibit 4F of the record; however, no medical record dated August 28, 2011 is in the appeal record.  Exhibit 4F contains only one Crawford Clinic report, which is dated August 8, 2011.

mentioned the January 18, 2012 MRI that showed mild changes, but no evidence of significant encroachment. (R. 19).

The ALJ also considered the claimant's characterizations of her allegedly limited daily activities. The ALJ did not consider the claimant's daily activities to be strong evidence in favor of finding the claimant disabled for two reasons. First, the claimant's function report is inconsistent with the claimant's daughter's third party adult function report. The claimant indicated that she is capable of attending to personal care, but could perform few other tasks without supervision. The claimant's daughter stated that the claimant had no problems with personal care, and regularly performed household chores while still able to shop for groceries and clothes. (R. 20).

Second, in March 2010, the claimant reported that she is unable to take strong medication because of her role as a caregiver. However, the claimant continued performing her caregiver duties despite her ailments and lack of medication. She indicated that she took care of her husband, stepson, and two cats in May 2012, and that she took care of her daughter in July 2013. After careful consideration of this subjective evidence, the ALJ concluded that the claimant's ability to care for not only herself, but others, supports the determination that the objective evidence outweighs the allegations regarding the claimant's daily activities. (R. 20-21).

The court finds that these reasons constitute substantial evidence to support the ALJ's determination that the claimant's subjective complaints do not warrant a disability. Consequently, the ALJ properly characterized the claimant's subjective complaints in light of the objective evidence presented.

VII. CONCLUSION

For the reasons stated above, this court concludes that substantial evidence supports the Commissioner's decision. Accordingly, this court AFFIRMS the decision of the Commissioner. The court will enter a separate order to the effect simultaneously.

The court will enter a separate Order in accordance with the Memorandum Opinion.

DONE and ORDERED this  28th day of February, 2017.


**KARON OWEN BOWDRE**
CHIEF UNITED STATES DISTRICT
JUDGE